**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ADEIA TECHNOLOGIES INC.;
ADEIA MEDIA HOLDINGS INC.; and
ADEIA MEDIA SOLUTIONS INC.,

     Plaintiffs,

v.

DISH NETWORK CORPORATION;
DISH NETWORK LLC;
DISH MEDIA SALES LLC;
DISH DBS CORPORATION;
ECHOSTAR CORPORATION;
SLING TV LLC; and
SLING TV HOLDING LLC,

     Defendants.

---

**COMPLAINT FOR PATENT INFRINGEMENT**

---

Plaintiffs Adeia Technologies Inc., Adeia Media Holdings Inc., and Adeia Media Solutions Inc. (collectively, "Plaintiffs" or "Adeia" or "Adeia Plaintiffs") bring this action for patent infringement against DISH Network Corporation (f/k/a EchoStar Communications Corporation); DISH Network LLC; DISH Media Sales LLC; DISH DBS Corporation; EchoStar Corporation; Sling TV LLC; and Sling TV Holding LLC (collectively, "Defendants" or "DISH") for infringement of U.S. Patent Nos. 8,219,927 ("the '927 Patent"); 8,239,546 ("the '546 Patent"); 8,327,013 ("the '013 Patent"); 9,369,758 ("the '758 Patent"); and 9,661,049 ("the '049 Patent") (collectively, the "Asserted Patents") (attached hereto as Exhibits 1–5). The Adeia Plaintiffs, on

personal knowledge as to their own acts and upon information and belief as to all others based on diligent investigation, allege as follows:

## NATURE OF THE ACTION

1.      Adeia is a leading innovator in media and entertainment technology, with a substantial patent portfolio covering key aspects of modern video delivery and streaming, among other technology segments. Adeia's patented inventions enable video content to be efficiently delivered, managed, and viewed across broadcast and internet-based platforms, including through adaptive streaming systems, distributed content delivery, and integrated advertising.

2.      Adeia's patent portfolio includes assets directed to technologies for delivering and managing streaming video content. These technologies include, among other things, systems for dynamically generating manifests for delivering streaming media, coordinating content delivery across network infrastructure, integrating advertising into video streams, and presenting and interacting with content through user interfaces across different devices.

3.      The "Accused Instrumentalities" comprise, at least, the DISH TV (Hopper Platform), DISH Anywhere, and Sling TV service. The Accused Instrumentalities utilize backend streaming systems and client-side applications to deliver video content to users. These systems include processes for delivering streaming media, incorporating advertising into video playback, managing user interaction with content, and controlling playback across multiple devices, which infringe one or more claims of Adeia's Asserted Patents.

4.      DISH has benefitted, and continues to benefit, from Adeia's innovations, which enable DISH to deliver video content to subscribers across devices and networks, incorporate

advertising into streaming content, and provide interactive viewing experiences. Adeia's patented technologies are integral to DISH's video services, including the Accused Instrumentalities.

5.      Adeia's practice is to engage with companies using its patented technologies in good faith to reach licensing arrangements that permit continued use of its innovations.

6.      Adeia brings this action to address DISH's continued, unauthorized use of its patented technology and to recover damages for that use.

## THE PARTIES

### A.      Adeia

7.      Plaintiff Adeia Technologies Inc. ("Adeia Technologies") is a Delaware corporation with a principal place of business at 3025 Orchard Parkway, San Jose, California 95134. Adeia Technologies is a wholly owned subsidiary of Adeia Inc., which is a publicly traded company (NASDAQ: ADEA). Adeia Technologies is the sole owner of all right, title, and interest in the '927 Patent.

8.      Plaintiff Adeia Media Holdings Inc. ("Adeia Media Holdings") is a Delaware corporation with a principal place of business at 3025 Orchard Parkway, San Jose, California 95134. Adeia Media Holdings is a wholly owned subsidiary of Adeia Inc. Adeia Media Holdings is the sole owner of all right, title, and interest in the '546, '013, and '049 Patents.

9.      Plaintiff Adeia Media Solutions Inc. ("Adeia Media Solutions") is a Delaware corporation with a principal place of business at 3025 Orchard Parkway, San Jose, California 95134. Adeia Media Solutions is a wholly owned subsidiary of Adeia Inc. Adeia Media Solutions is the sole owner of all right, title, and interest in the '758 Patent.

**B.**     **Defendants**

10.     On information and belief, Defendant DISH Network Corporation is a Nevada corporation with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH Network Corporation is registered to do business in Colorado and may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, DISH Network Corporation directs and oversees the operations of its own subsidiaries, including at least DISH Network LLC, DISH DBS Corporation, Sling TV LLC, and Sling TV Holding LLC, and is responsible for directing and overseeing the development, operation, and provision of the Accused Instrumentalities.

11.     On information and belief, Defendant DISH Network LLC is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH Network LLC may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, DISH Network LLC operates DISH's television services, including DISH TV and DISH Anywhere, and is responsible for the provision and operation of systems and functionality for content delivery associated with the Accused Instrumentalities.

12.     On information and belief, Defendant DISH Media Sales LLC ("DISH Media") is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH Media Sales LLC may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's

place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, DISH Media is the advertising arm of DISH and provides advertising services in connection with the Accused Instrumentalities.

13. On information and belief, Defendant DISH DBS Corporation is a Colorado corporation with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH DBS Corporation may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, DISH DBS Corporation operates DISH's television services, including DISH TV and DISH Anywhere, and is responsible for the provision and operation of systems and functionality for content delivery associated with the Accused Instrumentalities.

14. On information and belief, Defendant EchoStar Corporation (NASDAQ: SATS) is a Nevada corporation with its principal place of business at 100 Inverness Terrace East, Englewood, Colorado 80112. EchoStar Corporation is registered to do business in Colorado and may be served through its registered agent, Corporation Service Company, at 1900 W. Littleton Blvd., Littleton, Colorado 80120. On information and belief, EchoStar Corporation is a parent company within the DISH corporate family, including as the parent of DISH Network Corporation, and provides direction and oversight for the development, operation, and provision of the Accused Instrumentalities in coordination with its subsidiaries and affiliated entities, including DISH Network LLC, DISH DBS Corporation, Sling TV LLC, and Sling TV Holding LLC.

15. On information and belief, Defendant Sling TV LLC is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado

5

80112. Sling TV LLC may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, Sling TV LLC operates the Sling TV streaming pay-TV service and Sling Freestream.

16.    On information and belief, Defendant Sling TV Holding LLC is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. Sling TV Holding LLC may be served through its registered agent, Lawrence Reiner Katzin, located at PO Box 6655, Englewood, Colorado 80155, or at Mr. Katzin's place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. On information and belief, Sling TV Holding LLC holds ownership interests in entities involved in the operation and provision of the Sling TV service and related functionalities associated with the Accused Instrumentalities.

17.    On information and belief, Defendants operate as a coordinated enterprise. Each Defendant has acted as an agent of the others and has acted within the scope of that agency with respect to the Accused Instrumentalities. Each Defendant has knowingly participated in, directed, and/or controlled the acts of infringement alleged herein.

## JURISDICTION AND VENUE

18.    This Court has exclusive subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338.

19.    This Court has general personal jurisdiction over all Defendants because they are either incorporated in Colorado and/or maintain their corporate headquarters and principal places of business in Colorado.

6

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because, as described above, Defendants reside within this District and/or have a regular and established place of business in this District.

21.     Further, DISH has previously pled that venue is proper in this District. For example, in a 2016 action brought against various DISH entities, "DISH admit[ted] that venue is proper in this judicial district under 28 U.S.C. § 1391" and that "venue is proper in this judicial district as to DISH Network L.L.C., Sling Media, Inc., and Sling TV L.L.C. under 28 U.S.C. § 1400." *Two-Way Media Ltd. v. DISH Network Corp.*, C.A. No. 1:16-cv-00388-JLK, ECF No. 6 (Answer), ¶ 16 (D. Colo. May 18, 2016). More recently, various DISH and Sling entities have not contested venue in this judicial district. *See Sound View Innovs., Inc. v. DISH Network L.L.C.*, et al., C.A. No. 1:19-cv-03707-CMA-SKC, ECF Nos. 68 (Sling's Answer), 69 (DISH's Answer) (D. Colo. Mar. 26, 2020). Furthermore, an EchoStar entity recently agreed to transfer a case from the Southern District of Texas to this judicial district, where venue is proper. *See Err Content IP, LLC v. EchoStar Commc'ns Corp.*, C.A. No. 4:25-cv-05248-GCH, ECF Nos. 13 (Transfer Mot.), 16 (Transfer Order) (S.D. Tex. Jan. 30, 2026).

## FACTUAL BACKGROUND

### A.     Adeia's History of Innovation

22.     Adeia invents, develops, and licenses foundational technologies that shape how millions of people discover, access, and experience entertainment and that enhance billions of devices in an increasingly connected world. Through its innovations, Adeia plays a significant role in enabling modern media and technology ecosystems across platforms and devices.

23.     Adeia owns a substantial global portfolio of intellectual property, including more than 13,500 patent assets worldwide.[1] Its media-related patents cover core aspects of the entertainment experience, including technologies for delivering, streaming, and interacting with video content across broadcast and internet-based systems. The Asserted Patents are part of this portfolio. In addition to these media-related patents, Adeia maintains a significant semiconductor portfolio covering critical manufacturing and packaging technologies.

24.     Adeia's technologies build on decades of innovation in the media and entertainment industry undertaken by its predecessor companies, including United Video, Gemstar, Macrovision, Rovi, TiVo, and Xperi. Collectively, these companies developed technologies that transformed how users discover, access, and interact with video content across broadcast, recorded, and streaming environments.

25.     Adeia's innovation spans more than three decades and includes contributions from predecessor companies. For example, beginning in the 1980s and continuing through the 1990s, Adeia's predecessors, United Video (later Gemstar), pioneered electronic program guide ("EPG") technology, replacing static television listings with interactive, on-screen guides that allowed users to browse, search, and select TV programming. By the mid-1990s, these interactive guides were widely deployed across cable and satellite platforms, fundamentally changing how viewers navigated TV content.[2] Through subsequent mergers and acquisitions, including Macrovision's

---

[1] *See Adeia Named a Top 100 Global Innovator for 2026 by LexisNexis*, Globe Newswire (Mar. 19, 2026), https://www.globenewswire.com/news-release/2026/03/19/3258951/0/en/adeia-named-a-top-100-global-innovator-for-2026-by-lexisnexis.html.

[2] *See, e.g.*, Walter Hamilton & Karen Kaplan, *Can Gemstar Keep Rising?*, LA TIMES (Aug. 9, 1998), https://www.latimes.com/archives/la-xpm-1998-aug-09-fi-11494-story.html.

acquisition of Gemstar-TV Guide and later rebranding as Rovi, these technologies became part of the portfolio now owned and licensed by Adeia, forming an early foundation for modern on-screen interfaces and content navigation systems.[3] Between 2014 and 2017 alone, TiVo invested over $300 million in research and development in the TV programming and streaming industry.

26.   Similarly, Adeia predecessor TiVo Inc. transformed the television viewing experience through the introduction of digital video recorder ("DVR") technology, which replaced the VCR as the primary system for recording broadcast content in the home. TiVo's first commercially successful DVR, the TiVo HDR110, launched in 1999 and enabled users to pause, rewind, and record live television, fundamentally shifting control of the viewing experience from broadcasters to consumers. TiVo's innovations received widespread recognition. For example, then-FCC Chairman Michael Powell praised TiVo's technology at the 2003 Consumer Electronics Show, calling it "God's machine" and remarking, "I can't wait to walk in the house each day to see what it's recorded for me."[4] TiVo's DVR has also been recognized as one of the most influential consumer technology products, including being named among the "50 Best Tech

---

[3] *See* Michael Wolf, *Macrovision Becomes Rovi, Steps Into Liquid*, NY TIMES (July 16, 2009), https://archive.nytimes.com/www.nytimes.com/external/gigaom/2009/07/16/16gigaom-macrovision-becomes-rovi-steps-into-liquid-79997.html#:~:text=Targeted%20at%20makers%20of%20web,TV%2C%20newteevee%20and%20personal%20content.

[4] *See*, *e.g.*, Benny Evangelista, *PLENTY OF COMPANY / Everybody's talking about TiVo, but the digital video recorder pioneer is just one of many*, SFGATE (Feb. 24, 2003), https://www.sfgate.com/business/article/plenty-of-company-everybody-s-talking-about-2632474.php.

Products of All Time" by *PC World* and the "All-TIME 100 Gadgets" by *Time*.[5] TiVo's contributions to television technology have been recognized with multiple Emmy® awards.[6]

27.     In addition to offering its own DVR devices, TiVo licensed its innovations broadly across the television industry, enabling other providers to incorporate DVR functionality into their own systems. For example, DISH Network and EchoStar previously entered into licensing arrangements with TiVo relating to DVR technology used in their products.

28.     In 2016, Rovi acquired TiVo, combining TiVo's DVR and user experience innovations with Rovi's technologies relating to content discovery, metadata, and digital media delivery. The combined company continued to develop and license technologies across the evolving media ecosystem, including those relevant to modern streaming platforms.

29.     In 2020, the TiVo brand merged with Xperi, creating a multinational software company with business units in pay TV, media platforms, consumer electronics, and connected vehicles.[7]

---

[5] *See*, *e.g.*, Peter Ha, *All-TIME 100 Gadgets*, TIME (Oct. 25, 2010), https://content.time.com/time/specials/packages/completelist/0,29569,2023689,00.html.

[6] *See*, *e.g.*, Marketwired, *TiVo Awarded 2013 Emmy® Award for Technology and Engineering Achievement*, YAHOO! FINANCE (Aug. 12, 2013), https://finance.yahoo.com/news/tivo-awarded-2013-emmy-r-130000465.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAADMbIy7iPtl3m5VbtlrwTaKzhd_Jb8ZpWWB6I19Q9y5WkQLgUSBxQCaVvhaR1vuhN3SvfzT8pxnKmyVcSSW-j_LBdzZP6FU_dNSqu9xQ5wH_b2xLxCir0RdbAFDsxBoP4ve9T4jYEy8SqfzAr9mYCIPabR5Q61cfrweaFdOtWNpd; *see also* Charlie White, *TiVo Wins Emmy, Deserves It*, GIZMODO (July 27, 2006), https://gizmodo.com/tivo-wins-emmy-deserves-it-190287.

[7] *See*, *e.g.*, *Xperi and TiVo Complete Merger*, BUSINESS WIRE (June 1, 2020), https://www.businesswire.com/news/home/20200601005246/en/Xperi-and-TiVo-Complete-Merger.

30.    In 2022, Xperi's product business separated from the combined company to form Xperi Inc. (NYSE: XPER),[8] while Xperi's IP development and licensing business remained and rebranded to Adeia Inc.[9]

31.    Like its predecessors, Adeia continues to invest in technological innovation and the development of next-generation media. Adeia spends tens of millions of dollars per year on research and development, resulting in the growth of Adeia's patent portfolio. In the past few years alone, Adeia's inventors and engineers have partnered with R&D organizations and academic institutions on over thirty joint research projects.

32.    Beyond Adeia's internal R&D efforts, its patent portfolio has grown through strategic acquisitions from other leading-edge companies. For example, Adeia recently acquired certain patents from a global leader in content streaming, Brightcove Inc., whose predecessor, Unicorn Media, originally filed and was assigned one of the Asserted Patents (the '013 Patent).[10] Unicorn Media pioneered an innovative, cloud-based early streaming service called Once. The Once service was designed for digital media companies to reliably deliver live or on-demand video content to end users through dynamically customized streaming.[11] The Once service delivered

---

[8] *See*, *e.g.*, *Xperi Inc. Completes its Spin-Off to Become an Independent Public Company*, BUSINESS WIRE (Oct. 3, 2022), https://www.businesswire.com/news/home/20221003005282/en/Xperi-Inc.-Completes-its-Spin-Off-to-Become-an-Independent-Public-Company.

[9] *See*, *e.g.*, *On October 3, Xperi Inc. to Ring NYSE Opening Bell; Adeia Inc. to Ring Nasdaq Closing Bell*, NASDAQ (Sept. 26, 2022), https://www.nasdaq.com/press-release/on-october-3-xperi-inc.-to-ring-nyse-opening-bell-adeia-inc.-to-ring-nasdaq-closing.

[10] Brightcove was also the original assignee of the '546 Patent.

[11] *See*, *e.g.*, Timothy Fore-Siglin, *Brightcove Acquires Unicorn Media,* STREAMING MEDIA MAGAZINE (January 6, 2014), https://www.streamingmedia.com/Articles/Editorial/Featured-Articles/Brightcove-Acquires-Unicorn-Media-94064.aspx.

patented technology that allowed publishers to ingest content once and receive a single URL that could be requested by any IP-enabled video playback device. On the backend, the service would dynamically tailor the delivery of the streaming data/content to account for particular device needs. The Once service could also tailor the content to the user by, for example, inserting personalized ads into the stream to create a seamless, TV-like viewing experience.[12] Unicorn Media's groundbreaking technology garnered industry praise, earning top honors in the Digital Video Technology Platform category at the 2013 Cynopsis Digital Model D Awards.[13]

33.     Through its patent licensing program and partnerships, Adeia has been able to provide consumers with its many valuable innovations. Adeia's licensees have included top U.S. pay-TV providers and streamers such as Verizon, Cox Communications, Comcast, Charter, Frontier, Altice USA (Optimum Communications), YouTube, Google TV, Paramount+, and Pluto TV, and hardware manufacturers such as Sony, Roku, and Samsung. These major companies have all previously licensed Adeia's media patent portfolio, which supports the value of Adeia's technology, including the Asserted Patents.

---

[12] *See*, *e.g.*, Unicorn Media, Inc*., Unicorn Media Announces First-Of-Its-Kind Dynamic Ad Integration and Real-Time Analytics Support for Mobile Devices*, PR NEWSWIRE (Oct. 19, 2010), https://www.prnewswire.com/news-releases/unicorn-media-announces-first-of-its-kind-dynamic-ad-integration-and-real-time-analytics-support-for-mobile-devices-105245998.html; *see also* Unicorn Media, Inc*., Unicorn Media Announces Support for Adobe HTTP Dynamic Streaming*, PR NEWSWIRE (May 9, 2011), https://www.prnewswire.com/news-releases/unicorn-media-announces-support-for-adobe-http-dynamic-streaming-121490384.html.

[13] *See*, *e.g.*, Unicorn Media, Inc., *Unicorn Media Earns Cynopsis Digital Model D Award for Groundbreaking Unicorn Once™ Solution*, PR NEWSWIRE (Nov. 20, 2013), https://www.prnewswire.com/news-releases/unicorn-media-earns-cynopsis-digital-model-d-award-for-groundbreaking-unicorn-once-solution-232651281.html.

## B.    Defendants' Accused Instrumentalities

34.    Defendant DISH Network is a major provider of television and streaming services in the United States, offering satellite television, internet-based streaming, and related video services to millions of subscribers nationwide. Through its DISH TV service, DISH Anywhere, and Sling TV service, DISH delivers live, on-demand, and recorded video content across set-top boxes, mobile devices, and web-based platforms.

35.    DISH operates a large-scale video distribution infrastructure that includes broadcast systems, internet-based streaming technologies, and advertising platforms. As part of its expansion of internet streaming capabilities, DISH's affiliated technology entity, EchoStar, acquired Utah-based Move Networks in 2011, a provider of adaptive streaming technology designed for large-scale delivery of video over the internet.[14]

36.    On information and belief, DISH generates billions of dollars in annual revenue and serves millions of subscribers, making it one of the largest providers of pay television and streaming services in the United States. In addition to its DISH TV subscription service, DISH also offers U.S. customers Sling TV, which DISH helped launch in 2015 through its subsidiary Sling TV LLC and which provides internet-delivered television programming to subscribers on a subscription (e.g., Sling Blue, Sling Orange) and advertising-supported basis (Sling Freestream).

### 1.    DISH TV (Hopper Platform)

37.    Defendants provide subscription television services under the DISH brand ("DISH TV"), which include satellite-delivered broadcast television, digital video recording ("DVR")

---

[14] *David Goetzl, EchoStar Buys Move Net Technology,* MediaPost (Jan. 6, 2011), https://www.mediapost.com/publications/article/142498/echostar-buys-move-net-technology.html.

functionality, and internet-delivered streaming services. DISH TV is offered through Defendants'

Hopper family of set-top box receivers (the "Hopper Platform"), which serve as the central hub

for content delivery, recording, and streaming across user devices.



Source: https://dish.com/isg/dish-tv-packages/.



Source: https://my.dish.com/upgrades/products/receivers/the-hoppers.

38.     On information and belief, the Hopper Platform integrates multiple modes of

content delivery into a unified system, including traditional satellite broadcast television, DVR

functionality for recording and playback of content, and internet-based streaming, including on-

demand and over-the-top ("OTT") services.

14

39.     DISH markets the Hopper Platform as a "whole-home" entertainment system that combines live television, recorded content, and streaming applications into a single device and user interface.



Source: https://www.dish.com/features.

40.     DISH introduced the Hopper Platform in or around 2012 as its next-generation whole-home DVR system.[15] Since its introduction, on information and belief, DISH has released multiple iterations of the Hopper, including Hopper with Sling, Hopper 3, and Hopper Duo, each expanding the platform's streaming, recording, and multi-device capabilities.

41.     The Hopper Platform was designed to unify broadcast and internet-based content delivery, including integration with DISH Anywhere and over-the-top ("OTT") streaming applications. Later versions, such as the Hopper with Sling and Hopper 3, expanded remote streaming capabilities and enabled users to access live and recorded content outside the home over internet connections.

---

[15] *See* DISH NEWSROOM, *DISH Introduces Hopper and Joey - Next Generation Whole-Home HD DVR Entertainment System*, https://www.dish.com/dish-newsroom/posts/pressreleases/dish-introduces-hopper-and-joey---next-genera.

42.    The Hopper Platform enables simultaneous recording and playback of multiple programs. For example, DISH advertises that certain Hopper models (e.g., Hopper 3) can record or stream numerous programs simultaneously and support multiple televisions within a household.

## Compare the Hopper Family of Receivers

| Feature | Hopper 3 | Hopper with Sling | Hopper | Hopper Duo | Wally |
|---|---|---|---|---|---|
| Watch or Record Multiple Shows at Once | Up to 16 | Up to 3[1] | Up to 3[1] | Up to 2 | 1[2] |
| Number of TVs Supported | 7 | 4 | 4 | 2 | 1 |
| Recording Capacity | 2 TB | 2 TB | 2 TB | 500 GB | N/A |
| **Monthly Fees** | | | | | |
| DVR Fee | $15 | $15 | $15 | $10 | N/A |
| Receiver Fee: First TV | Included | Included | Included | Included | $7 |
| Receiver Fee: Joey on second TV | $7 | $7 | $7 | $7 | N/A |
| **DISH Anywhere[3]** | | | | | |
| Watch live or recorded TV | ✓ | ✓ | | | |
| Watch On Demand | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Built-In Apps** | | | | | |
| Netflix | ✓ | ✓ | | ✓ | ✓ |
| Amazon Prime Video | ✓ | ✓ | | | |
| YouTube | ✓ | ✓ | | | |
| YouTube Kids | ✓ | ✓ | | | |
| **Features** | | | | | |
| PrimeTime Anytime[3] | ✓ | ✓ | ✓ | | |
| Bluetooth | ✓ | ✓ | ✓ | ✓[3] | ✓[3] |
| 4K Capable | ✓ | | | | |
| Internal Wi-Fi | ✓ | ✓ | | ✓ | |

[1] Up to 6 simultaneous recordings when the Primetime Anytime feature is enabled and recording primetime content from ABC, CBS, NBC, and FOX
[2] Wally requires an external hard drive (sold separately) in order to record
[3] With Bluetooth Adapter, sold separately

Find the right receiver for you

Source: https://my.dish.com/upgrades/products/receivers/the-hoppers.

43.     DISH TV also provides user interface overlays, including on-screen notifications, such as notifications from a Google Nest video doorbell.



Source: https://www.dish.com/features.

44.     Defendants also provide advertising-supported streaming functionality through DISH Media, including its "DISH Connected™" platform, which is designed to deliver television advertising within internet-delivered video streams. DISH Connected is marketed as enabling "linear TV to the digital ad marketplace," allowing advertisers to access and deliver advertisements within live and streaming television environments in the "same manner as a Sling TV campaign."

## DISH Media Brings Linear TV to the Digital Ad Marketplace with DISH Connected™

- *DISH Connected™ blends Connected TV (CTV) and linear addressable TV advertising in an important step forward for programmatic advertising.*
- *Advertisers can now complement their CTV buys on SLING TV with access to premium DISH TV inventory.*

NEW YORK, May 31, 2023 /PRNewswire/ -- DISH Media, leaders in impression-based TV advertising, today launched DISH Connected™, a first-of-its-kind solution that allows DISH TV's live linear inventory to be programmatically executed. This groundbreaking solution delivers real-time, targeted advertisements to internet-connected DISH set-top boxes, providing advertisers access to DISH inventory in the same manner as a SLING TV campaign.

"Marketing dollars continue to shift more towards the most effective and efficient solutions that allow for optimal targeting and full campaign measurement," said Kevin Arrix, SVP, DISH Media. "DISH Connected™ is the latest example of how technology can resolve traditional TV's inefficiencies and puts DISH Media at the forefront in driving more accountable, impression-based buying."

Source: https://www.dish.com/dish-newsroom/posts/pressreleases/dish-media-brings-linear-tv-to-the-digital-ad.

45.    DISH Connected facilitates the delivery of advertisements within streaming content by integrating advertising into the video distribution workflow to deliver advertisements in real-time. DISH Media promotes this platform as enabling advertisers to reach viewers across streaming services, including Sling TV, through digital ad delivery mechanisms that operate within the streaming infrastructure.

Advertisers are now able to programmatically transact on premium DISH set-top box inventory through private auctions set up with demand-side platforms (DSP) like The Trade Desk and Yahoo DSP, as well as the sell-side platform (SSP) Magnite. As viewers watch content on their DISH internet-connected set-top boxes, advertisers can bid on and deliver advertisements to them in real-time. This allows advertisers to extend their reach to an expanded footprint and to make a single buy programmatically across both SLING and DISH inventory.

CTV ad spend continues to surge and with this new effort DISH Media combines CTV and linear advertising accessibility, delivering new inventory, expanded reach, and added scale to advertisers like Horizon Media, Havas Media, Stagwell and Camelot Strategic Marketing & Media.

"We continue to place a strong emphasis on programmatic advertising, recognizing it as a powerful tool for delivering targeted and effective ad campaigns," said Alexander Stone, SVP, Advanced Video & Agency Partnerships, Horizon Media. "Having invested heavily in programmatic buying across premium CTV inventory, we're excited to take advantage of this new offering from DISH Media. DISH Connected™ allows us to open up a larger inventory pool for our clients, making the buying experience more accessible than before."

Accessing programmatic ad inventory is easy and familiar for digital buyers. DISH Connected™ introduces a new set of impressions to the market, giving advertisers a new opportunity to capture premium live inventory with programmatic efficiency.

Source:    https://www.dish.com/dish-newsroom/posts/pressreleases/dish-media-brings-linear-tv-to-the-digital-ad.

### 2.    DISH Anywhere

46.    DISH Anywhere is Defendants' internet-based application that allows DISH subscribers to watch live television, access on-demand programming, and view recorded content from their DVRs on mobile devices, tablets, and web browsers. The service enables subscribers to access their television content outside the home using internet-connected devices and to view recorded shows even when offline.

47.    Through DISH Anywhere, users can stream live channels included in their DISH subscription, watch recorded programs stored on their Hopper DVR, and access a library of on-demand content.



Source: https://www.dish.com/features/dish-anywhere.

## Authorize/Deauthorize Devices

Watching On Demand content on DISH Anywhere will automatically authorize the device you're using. **A maximum of five devices may be authorized for On Demand content at once.** If you have five authorized devices and use a new phone or tablet, or log into dishanywhere.com on a new browser, the oldest authorized device on your account will be automatically deauthorized.

If you have five Fire TV or Android TV devices authorized, you'll need to manually deauthorize some via dishanywhere.com in order to use a new one.

Deauthorizing a device does not log that device out of DISH Anywhere. **You can still watch live TV,** but watching On Demand content will cause your device to count toward the device limit.

Source: https://support.dish.com/services/dish-anywhere/authorize-devices.

### 3.      Sling TV Service

48.      Sling TV is an internet-delivered television service launched by DISH in 2015 that provides subscribers with access to live television channels and on-demand programming over the

internet. Offered through subscription packages, Sling TV delivers video content to users on a variety of devices, including smart televisions, streaming devices, mobile devices, and web browsers. The service allows users to select and stream programming without requiring a traditional cable or satellite TV subscription.



Source: https://www.sling.com/.



Source: https://www.sling.com/help/en/troubleshooting/device-questions/multiple-screens.

49.    In addition to its subscription offerings, Defendants provide Sling Freestream, a free, ad-supported streaming service that offers users access to a selection of live channels and on-demand content. Sling Freestream delivers video content supported by advertising, enabling users

to access programming without a paid subscription. Together, Sling TV and Sling Freestream form part of Defendants' internet-based video distribution and advertising ecosystem.



Source: https://www.sling.com/freestream.

50.     DISH has touted Sling TV's "industry-leading dynamic ad insertion (DAI) into live streaming" as critical to the platform's ad revenue, noting in 2018 that DAI "fueled the tripling of [Sling TV's] advertising revenue in 2018, adding a multiplier on top of tenfold growth reported for 2017."



Source: https://web.archive.org/web/20190416190824/https://about.dish.com/Innovation-in-live-dynamic-ad-insertion-triples-Sling-TV-ad-revenue-in-2018; *see also Sling TV Tripled Advertising Revenues In 2018, Credits Dynamic Ad* Insertion, Digital News Daily, https://www.mediapost.com/publications/article/332563/sling-tv-tripled-advertising-revenues-in-2018-cre.html.

## OVERVIEW OF THE ASSERTED PATENTS

### A.    The '927 Patent

51.    On July 10, 2012, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 8,219,927 ("the '927 Patent"), entitled "Revealing of truncated content on scrollable grid," to inventors Kang Su Gatlin, Elyssa Cox, Rebecca Penick, Erika Carlson, and Anthony Young. The '927 Patent issued from U.S. Application No. 12/349,388, filed on January 6, 2009, and claims a priority date of January 6, 2009. A true and correct copy of the '927 Patent is attached hereto as Exhibit 1 and is incorporated herein by reference.

22

52.     Plaintiff Adeia Technologies Inc. owns all rights, title, and interest in the '927 Patent, and holds all substantial rights, including the right to sue and recover for past, current, and future damages.

53.     The '927 Patent is valid and enforceable. The '927 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '927 Patent is directed to novel and unconventional improvements to the efficiency of the user interface of computing devices. It addresses a specific, technological improvement to the challenges that arise when presenting non-uniform grids of content within a limited display space, such as on a mobile device with a small screen. *See* Ex. 1 at 5:18–19 (discussing "personal digital assistant (PDA)" and "computer-enabled wireless telephone").

54.     The '927 Patent provides an improved user interface to present a non-uniform grid of content in limited screen space on the interface of a computing device. *See* Ex. 1 at 1:22–23; 2:1–11. The claims of the '927 Patent provide specific improvements in the functioning of the device's display system, allowing smoother and more efficient rendering of scrollable grids by eliminating abrupt refreshes and discrete jumps within a non-uniform grid.

55.     Information on a computer screen may be displayed using a grid of cells, organized into rows and columns. *Id.* at 1:6–8. While the cells may be uniform, *id.* at 1:11–13, many practical interfaces—including programming guides, schedules, and merged-cell spreadsheets—use non-uniform grids with cells of differing sizes and offsets. *Id.* at 1:14–16; 2:25–52. Often, the content assigned to a cell is too large for the size of the cell. This content may be truncated to fit in the cell. *Id.* at 1:16–18; *see also id.* at Fig. 2. This is most apparent in computer systems with limited screen size, including mobile devices using non-uniform grids.

56.    Conventional approaches would simply "refresh content" shown in an expanded cell. *Id.* at 3:45–50. This led to inferior user experience in which the scrolling appeared "to be a more discontinuous, choppier movement"—particularly on non-uniform grids. *Id.* at 3:19-23. This can make scrolling "appear to a user as a sudden, discontinuous process." *Id.* at 3:47-48.

57.    The '927 Patent overcomes these technical challenges of handling non-uniform grids and the constraints of limited screen space by expanding a cell in a first direction without expanding the cell in another direction when scrolling, thus improving the user's experience with the user interface by enabling the device to process grid scrolling and cell resizing more efficiently and smoothly, avoiding the discrete, choppy movements characteristic of conventional systems. *See id.* at cls. 1, 10, 16; 3:36-50; 5:56–59; Figs. 2–10.

58.    These technical improvements are embodied in the claims of the '927 Patent. For example, Claim 1 recites, among other things, "during scrolling, increas[ing] the size of the cell in a first direction relative to other cells to a second, larger size while not increasing the size of the cell in another direction transverse to the first direction," and "animat[ing] a revealing of the truncated portion of the content item based upon the second, larger size of the cell." *Id.* at 5:56–59. This claim language reflects a particular manner of updating cell geometry and cell contents that specifies how the device's rendering pipeline processes scrolling to improve the user interface and performance. And the ordered combination of the elements of Claim 1 was not well-understood, routine, or conventional.

59.    Further, when the non-uniform grid contains more content than can fit on the screen at once, the user can "scroll" this non-uniform grid through a variety of input devices. *Id.* at 3:4–23.

60.     The invention of the '927 Patent can also be performed on a touch-sensitive display device. For example, Claim 16 recites "a method of presenting a scrollable non-uniform grid of content in the form of a media programming guide on a touch-sensitive display device and updating content of a cell of the non-uniform grid during scrolling of the grid, the method comprising:" and includes the steps "during scrolling, horizontally increasing a size of the cell to a second, larger size" and "during horizontally increasing the size of the cell, animating a revealing of a truncated portion of the content item as the size of the cell increases from the first, smaller size to the second, larger size." *Id.* at 7:1–8:4. These limitations are further geared towards solving the device-specific technological problems of non-uniform grid rendering, particularly for small screens that utilize touch input.

61.     In sum, the claims recite specific, technical solutions to identified problems with conventional approaches. The '927 Patent thus enables navigating non-uniform grids of content via an improved user interface on devices with display constraints, which improves the functioning of the devices themselves. The detailed embodiments and figures in the specification demonstrate that the inventors possessed the claimed subject matter, and the specification enables a person of ordinary skill in the art to implement the invention without undue experimentation.

**B.     The '546 Patent**

62.     On August 7, 2012, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 8,239,546 ("the '546 Patent"), entitled "Global access control for segmented streaming delivery," to inventor Albert John McGowan. The '546 Patent issued from U.S. Application No. 13/245,324, filed on September 26, 2011, and claims priority to the same. A true

and correct copy of the '546 Patent is attached hereto as Exhibit 2 and is incorporated herein by reference.

63.    Plaintiff Adeia Media Holdings Inc. owns all rights, title, and interest in the '546 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

64.    The '546 Patent is valid and enforceable. The '546 Patent is not directed to an abstract idea or any patent-ineligible concept. Rather, the '546 Patent is directed to providing concrete, improved systems and methods for controlling access to streaming media assets during segmented streaming delivery. The patent addresses a specific technical problem that arises in cloud-based media delivery architectures that rely on "chunking," such as those that divide a media asset into a plurality of smaller segments for sequential transmission to an end user device over a network. Ex. 2 at 1:17–27. In such architectures, media content is streamed to end user devices by transmitting segments sequentially, enabling features such as content protection and the ability to seek playback to undownloaded portions of a media asset. *Id.*

65.    The '546 Patent identifies a technical deficiency in prior streaming media systems: authentication of whether a user account and user device were authorized to access a media asset was typically performed only once, at the time the user device initially began streaming. *Id.* at 5:50–6:21. Once the initial authentication was confirmed, the computer system responsible for verifying the user's credentials was often separate from the computer system responsible for transmitting the media stream. *Id.* at 6:4–10. As a result, the authenticating system had no ongoing mechanism to determine whether the media stream was still active—for example, whether the user had stopped playback five minutes into a two-hour video or had permitted the video to play in its

entirety. *Id.* at 5:62–6:3. This architectural separation between authentication and streaming meant that the system lacked the ability to monitor the ongoing state of a streaming session after initial authorization was granted.

66.    This deficiency created a specific technical vulnerability. Because the streaming system performed no session-state monitoring after initial authentication, a second user device linked with the same user account could initiate a separate streaming session while the first device was still receiving content. *Id.* at 6:4–18. The system had no way to detect or prevent this concurrent access. In practical terms, a single subscription-based user account could be used, potentially fraudulently, to stream media assets simultaneously to multiple devices at different physical locations, undermining the content provider's access controls and subscription model. *Id.* at 6:18–36. The '546 Patent explains that this problem was "a particular issue where a subscription (*e.g.*, a monthly or yearly subscription) is required to access the media assets." *Id.* at 1:38–41.

67.    To solve this problem, the '546 Patent discloses and claims a specific technical architecture that integrates one or more mechanisms operating together during a streaming session. *See, e.g.*, *id.* at cl. 8.

68.    For example, Claim 8 recites a processor that receives "beaconing data" from a first user device "during" an "ongoing" transmission of a media asset, stores "session information" that is "at least partially based on" that beaconing data and that affirmatively "indicates the first user device and the user account have an active session," and "controls access" by additional user devices linked to that account "at least while" the session information indicates an active session exists.

69.      The ordered combination of those elements—receiving beaconing data during live transmission, deriving and storing session information affirmatively linked to both the device and the account, and continuously controlling multi-device access based on that session information—embedded in a processor coupled with a network interface and a memory configured to store media segments, constitutes an integrated technical architecture that did not exist before, cannot operate outside of the networked segmented-streaming context and would not preempt all approaches to the underlying problem of multi-device access control. Similarly, the ordered combination was not well-understood, routine or conventional.

70.      The specification confirms that this ordered combination solves a particular technological problem and contains added benefits that did not exist in the prior art. As one example, the ordered combination provides for the added benefit that it enables the possibility of gaining information on the status of the media player via inference. The '546 Patent discloses a beaconing mechanism by which a computer system receives data from the end user device during transmission of the media asset. *Id.* at 10:47–65. Rather than relying solely on affirmative status reports from the client media player, which the patent recognizes are not universally available, the system may also derive beaconing data from the pattern and timing of the end user device's requests for media segments and index files. *Id.* at 10:51–53. For example, the system may infer that a user has paused playback if the time between successive requests exceeds the playback duration of the previously requested segment, may infer a skip if a request targets a non-sequential segment, and may determine that the session has stopped if no request is received within a specified timeout period. *Id.* at 10:51–65, 15:60–16:8. This approach transforms what would otherwise be passive content-delivery requests into active session-monitoring signals.

28

71. The '546 Patent also discloses storing session information linked with the user device and the user account, where that session information is at least partially based on the beaconing data. *Id.* at 12:56–13:7. The stored session information may include identifiers such as the username, the device type, the media asset being streamed, and the session state (*e.g.*, active or inactive). *Id.* This stored session information provides the system with an ongoing, structured record of which user accounts and devices have active streaming sessions at any given moment.

72. Based on the stored session information, the system also enforces access control on a per-session basis during streaming. When a second user device linked with the same user account attempts to stream a media asset, the system evaluates the stored session information to determine, for example, whether the user account is already linked with the maximum number of permitted active sessions. *Id.* at 18:45–19:16. If the maximum has been reached, the system determines which device is permitted to continue accessing media assets based on configurable rules and can, for example, cease transmission of the remainder of the plurality of media segments to the first user device by withholding subsequent index files so that the first user device cannot retrieve further segments. *Id.* at 14:28–40, 19:48–20:19.

73. This integrated technical architecture provides a concrete improvement to the functioning of cloud-based streaming media delivery systems. Rather than relying solely on an initial, one-time authentication check that is divorced from the ongoing media delivery process, the '546 Patent's claimed methods and systems embed access control directly into the segmented streaming pipeline itself. The system derives session state from the streaming process, stores that state in a structured manner, and uses it to make ongoing access-control decisions. *Id.* at Abstract; 1:46–2:3.

74.    The claims recite specific, technical solutions to identified problems with conventional approaches. The detailed embodiments and figures in the specification demonstrate that the inventor possessed the claimed subject matter. The specification enables a person of ordinary skill in the art to implement the invention without undue experimentation.

### C.    The '013 Patent

75.    On December 4, 2012, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 8,327,013 ("the '013 Patent"), entitled "Dynamic index file creation for media streaming," to inventors Albert John McGowan and Richard L. Carls. The '013 Patent issued from U.S. Application No. 13/429,656, filed on March 26, 2012, as a continuation of U.S. Application No. 12/976,883, filed on December 22, 2010, and claims priority to Australian Patent Application No. 2010202741, filed on June 30, 2010. A true and correct copy of the '013 Patent is attached hereto as Exhibit 3 and is incorporated herein by reference.

76.    Plaintiff Adeia Media Holdings Inc. owns all rights, title, and interest in the '013 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

77.    The '013 Patent is valid and enforceable. The '013 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '013 Patent is directed to novel and unconventional systems and methods for improving the efficiency and flexibility of media streaming systems through specific request-driven generation of index files, allowing for dynamic insertion of media other than the underlying program, such as advertisements. *Id.* at Abstract; 1:49–2:29, 4:43–58, Fig. 6; *see, e.g.*, *id.* at cls. 1, 8, 15. The claimed systems and methods can reduce preprocessing, reduce storage, and enable streaming to be tailored to a particular requesting

device, including tailored "insertion of advertisements at any point during playback of the media file." *Id.* at 1:53–57.

78.    Streaming generally involves "chunking" the media file being streamed—dividing it up into smaller segments for delivery to user devices. These individual chunks may each be a few seconds long (*e.g.*, 3 to 10 seconds, depending on a variety of factors). Often, multiple versions of each chunk are made available at different quality levels (*e.g.*, different bitrates). One or more index files or manifests are provided to the user device to provide it information about how to stream the content, such as information about where to locate the available chunks.

79.    A traditional approach to preprocessing media for streaming involves chunking and storing media assets, then creating and storing corresponding static index files or manifests. The claimed inventions, however, improve on streaming technology by enabling the server to dynamically generate a manifest for a particular device at the time it is requested. Consequently, different devices can receive different manifests for the same requested content. For example, different or personalized advertisements could be selected for inclusion on two different devices, even when viewing the same media content. Dynamic manifest generation thus allows integration of advertisements or other supplemental content in a more customizable and tailored way.

80.    Before the invention of the '013 Patent, streaming workflows typically required extensive preprocessing—multiple encodes across reference bitrates, pre-chunking into segments, and static indexing—which consumed storage and deprived providers of the flexibility to insert additional media seamlessly during playback. *Id.* at 1:21–43. In particular, "a significant amount of preprocessing is required to prepare media for streaming," and "[t]his preprocessing leaves little flexibility for inserting an advertisement during streaming and can require a large amount of

storage space to store the preprocessed chunks of media." *Id.* at 1:34–44. Static approaches, including Hypertext Transfer Protocol (HTTP) streaming, "required chunking and storing media assets, and generating corresponding index files," making it difficult to make dynamic decisions about ad insertion, segment length, or session reporting, and constrained the ability to tailor a stream to the requesting device and current conditions. *Id.* at 4:14–28.

81.    To overcome these technical shortcomings, the '013 Patent claims systems and methods for dynamically generating index files that respond to client requests during playback by determining segments for streaming, deciding whether to include media "other than the media file" in the segments, determining starting and ending points, and then generating and providing a corresponding index file "during playback" to control streaming of the program. *Id.* at 1:49–57, 4:43–58; cls. 1, 8, 15. This allows the system to perform functionality that was previously unattainable—inserting targeted advertisements or other supplemental content at any point in the stream, all of which can be determined during playback. In some instances, dynamic manifest generation may also enable dynamic chunking of content. *See id.* at 1:49–57, 10:20–31, 12:64–13:3, 13:49–57. For example, the next chunk of media may not be cached at a location specified in a manifest, in which case the chunk may be dynamically created by pulling all or part of the media file of interest from a media file origin, chunking it, and making it available for download. The chunk also may be cached, thereby eliminating the need to create the chunk again if it is requested at some later time.

82.    These technical advancements are reflected in the claims, which recite, for example, receiving a request for a first index file; determining a first segment of a media file composed of one of a plurality of separately addressable segments; deciding whether to include

32

media other than the media file in that segment; determining starting and ending points; generating and providing the index file; and then, during playback, repeating the process for a second requested index file. *See, e.g.*, *id.* at cl. 8. The ordered combination—dynamic, per-request index-file generation and segment-boundary control during playback—constitutes a specific technical solution to the rigidity and overhead of preprocessed streaming. And the ordered combination of the claims was not well-understood, routine, or conventional.

83.    In fact, the advance represented by the '013 patent was praised by the industry when it was introduced commercially. The '013 patent's patented technology was recognized for its ability to tailor content delivery and ad-insertion on the fly, server-side, in real-time rather than hours. The technology was specifically acknowledged for rendering the distribution of content to any IP-enabled device less time consuming and less expensive, enabling content owners to cut cost and maximize profitability.[16]

84.    The claims recite specific, technical solutions to identified problems with conventional approaches. The detailed embodiments and figures in the specification demonstrate that the inventor possessed the claimed subject matter. The specification enables a person of ordinary skill in the art to implement the invention without undue experimentation.

---

[16] *Unicorn Media Enables Video Monetization For Screen Media's Popcornflix*, UNICORN MEDIA (Apr. 25, 2012), https://www.prnewswire.com/news-releases/unicorn-media-enables-video-monetization-for-screen-medias-popcornflix-148861135.html; *Unicorn Media Powers Ad Delivery to Mobile Devices for TidalTV*, UNICORN MEDIA (Nov. 29, 2011), https://www.prnewswire.com/news-releases/unicorn-media-powers-ad-delivery-to-mobile-devices-for-tidaltv-134666098.html.

D.      **The '758 Patent**

85.     On June 14, 2016, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,369,758 ("the '758 Patent"), entitled "Multifunction multimedia device," to inventors Amir Gharaat, James Barton, and Mukesh K. Patel. The '758 Patent issued from U.S. Application No. 14/259,145, filed on April 22, 2014, as a continuation of U.S. Application No. 12/631,770, filed on December 4, 2009 (now U.S. Patent No. 8,704,854), and claims domestic priority to U.S. Provisional Application No. 61/242,277, filed on September 14, 2009. A true and correct copy of the '758 Patent is attached hereto as Exhibit 4 and is incorporated herein by reference.

86.     Plaintiff Adeia Media Solutions Inc. owns all rights, title, and interest in the '758 Patent, and holds all substantial rights, including the right to sue and recover for past, current, and future damages.

87.     The '758 Patent is valid and enforceable. It is not directed to an abstract idea or any patent-ineligible concept. Instead, the '758 Patent is directed to specific, technology-focused improvements that enable a multimedia device to receive a message from a remote source while receiving media content and to overlay information associated with the message directly into uncompressed high-definition frames in a frame buffer for real-time display. *See* Ex. 4 at cls. 1, 11. Ultimately, the claimed invention "display[s] [ ] the media content . . . with the message overlaying the media content." *Id.* The claims of the '758 Patent recite an improved way to present messages at the same time as media content involving the use of specific computer components.

88.     Before the invention of the '758 Patent, consumer multimedia systems typically presented content in a fixed, non-editable manner that limited interactivity and did not provide an

34

integrated, frame-buffer-level mechanism to composite external messages during playback. *Id.* at 1:32–37.

89.     To overcome these technical shortcomings, the '758 Patent claims and describes systems and methods that, during playback, receive "media content from a media source," load "one or more uncompressed high-definition frames of the media content into a frame buffer," receive "from a remote source and concurrently with receiving the media content, a message," and then "writ[e] information associated with the message into the frame buffer to overlay at least a portion of the . . . uncompressed high-definition frames," followed by "sending the media content to a display device for display . . . with the information associated with the message overlaying the media content." *Id.* at cls. 1, 11, 21.

90.     The '758 Patent further describes devices that are capable of receiving messages to be presented to the user while concurrently playing audio/video content. *Id.* at 4:46–5:3. Messages may be received or represented in many forms, including text, audio, and images. *Id.* at 22:61–23:3.

91.     The specification provides further implementation details for this compositing functionality. One method of presenting a message is via superimposition on top of a frame of video content. *Id.* at 9:32–45. If the video frame is loaded into a frame buffer, then superimposition may be accomplished by writing additional data into the same frame buffer. *Id.* at 11:54–59. Separate frame buffers may be used for media content and message content, where the screen presents information from both buffers. *Id.* at 23:36–39. The hardware architecture ties these operations to specific components; for example, Figure 1B illustrates a media device in which the frame buffer(s) may reside in the memory system. *Id.* at Fig. 1B, 8:26–34; 9:5–15.

92. The claims recite specific, technical solutions to identified problems with conventional approaches. The detailed embodiments and figures in the specification demonstrate that the inventor possessed the claimed subject matter. The specification enables a person of ordinary skill in the art to implement the invention without undue experimentation.

### E. The '049 Patent

93. On May 23, 2017, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,661,049 ("the '049 Patent"), entitled "Systems and methods of providing interspersed manifest file specifications for adaptive video streaming," to inventor Michael Gordon. The '049 Patent issued from U.S. Application No. 15/215,889, filed on July 21, 2016, as a continuation of U.S. Application No. 14/709,171, filed on May 11, 2015 (now U.S. Patent No. 9,426,089), and claims priority to U.S. Provisional Application No. 62/072,265, filed on October 29, 2014. A true and correct copy of the '049 Patent is attached hereto as Exhibit 5 and is incorporated herein by reference.

94. Plaintiff Adeia Media Holdings Inc. owns all rights, title, and interest in the '049 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

95. The '049 Patent is valid and enforceable. It is not directed to an abstract idea or any patent-ineligible concept. Instead, the '049 Patent is directed to novel and unconventional systems and methods for generating and serving adaptive streaming manifest files that include an interspersed sequence of URLs referencing video segments hosted on different domains. As the specification explains, an "issued manifest file includes a first URL and a second URL," where the "first URL references a first video segment file from the set of video segment files and the

36

second URL references a second video segment file from the set of video segment files." Ex. 5 at Abstract, 3:11–16. "The first video segment file referenced by the first URL is hosted within a first domain and the second video segment file referenced by the second URL is hosted within a second domain that is different from the first domain." *Id.* at 3:16–20.

96.     Before the invention of the '049 Patent, adaptive streaming systems generated manifests that identified segment locations but lacked mechanisms to control how segment requests were distributed across multiple delivery sources. The specification notes that "[o]ne of the major drawbacks of streaming is that the quality of a user's experience is highly dependent on network performance and bandwidth." *Id.* at 5:8–10. As a result, these systems were limited in their ability to manage delivery performance, as "[w]ithout performance measurements and monitoring, it can be difficult to identify when a service provider is causing performance issues and the technical conditions under which user experience is affected." *Id.* at 6:1–5. These limitations reduced flexibility in directing traffic across content delivery infrastructures and hindered optimization of streaming performance.

97.     To overcome these technical shortcomings, the '049 Patent claims introduce systems and methods to create an "issued manifest file" from a source manifest and that includes an interspersed arrangement of URLs corresponding to segment files hosted on different domains. *Id.* at 3:4–21; cls. 1, 8, 15. For example, the specification explains that "[d]istribution policies determine the allocation of URLs in a given variant manifest file among the possible URL types," *id.* at 11:30–31, and that URLs may be "interspersed" such that different service providers or domains are used in a controlled pattern. *Id.; see also id.* at cls. 1, 8, 15. The claims likewise recite

37

determining "an interspersing pattern of URLs" in which segment URLs hosted by different domains are arranged within a manifest. *Id.* at cls. 1, 8, 15.

98. These techniques provide a concrete, network-level improvement in how streaming clients retrieve media segments by embedding delivery decisions directly into the manifest. In particular, the system defines "an interspersing pattern of URLs" that correspond to domains tied to different infrastructure services. By embedding these decisions into the manifest itself, the system improves delivery resilience, as the client executes a multi-CDN request path that, for example, hedges against provider-specific variance and outages (a known problem in adaptive streaming), enables performance monitoring, and allows dynamic control over streaming behavior during playback. *Id.* at 5:10–29; 12:37–56. As another example, this approach also supports faster startup—*e.g.*, "the first segment of the video is delivered to the user at the fastest transmission rate possible"—and enables policy-driven load allocation and per-segment performance measurement across delivery backends. *Id.* at 16:43–55, 5:16–36, 6:1–25; *see also* cls. 1, 6, 13.

99. These technical advancements are reflected in the claims, which recite, for example, "receiv[ing] a request for data relating to an interspersed manifest file," "determin[ing] an interspersing pattern of URLs such that a first subset of URLs . . . are interspersed among a second subset of URLs," and "transmit[ting] . . . data identifying . . . a second domain configured to serve the second subset of the video segment files." *Id.* at cls. 1; *see also* cls. 8, 15. The claims further require that the interspersed URLs reference segment files "encoded at a plurality of reference bitrates," tying the invention to adaptive streaming architectures. *Id.* The ordered combination—generation of an issued manifest incorporating domain-level interleaving and transmission of domain-identifying data—constitutes a specific technological solution for

38

controlling segment delivery across multiple domains in adaptive streaming systems to avoid the volatility associated with relying on individual providers.

100.    The claims recite specific, technical solutions to identified problems with conventional approaches. The detailed embodiments and figures in the specification demonstrate that the inventor possessed the claimed subject matter. The specification enables a person of ordinary skill in the art to implement the invention without undue experimentation.

## COUNT I: INFRINGEMENT OF THE '927 PATENT

101.    Adeia incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

102.    DISH has directly infringed and continues to directly infringe the '927 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, offering to sell in the United States, and/or importing into the United States infringing products and/or services, including at least the Sling TV service, and/or inducing others to do the same. DISH derives revenue from the activities relating to these Accused Instrumentalities.

103.    As illustrated in Exhibit 6, which is incorporated herein by reference, DISH infringes at least Claim 16 of the '927 Patent by implementing its media programming guides in the Accused Instrumentalities.

104.    DISH took the above actions intending to infringe and/or to cause infringing acts by others. For example, DISH and Sling TV promote and demonstrate their scrollable media programming guides in the Accused Instrumentalities, instruct users to use these media guides, and provide product materials and support content that encourages users to use these guides.

39

105. On information and belief, DISH also actively, knowingly, and intentionally induces infringement of one or more claims of the '927 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Instrumentalities.

106. DISH's acts of infringement have caused damage to Adeia. Adeia is entitled to recover from DISH the damages sustained by Adeia as a result of its wrongful acts in an amount subject to proof at trial.

107. Adeia provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality and reserves the right to present additional or alternative explanations of infringement for other claims and functionalities of the services.

<b><u>COUNT II: INFRINGEMENT OF THE '546 PATENT</u></b>

108. Adeia incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

109. DISH has directly infringed and continues to directly infringe the '546 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, offering to sell in the United States, and/or importing into the United States infringing products and/or services, including at least the DISH TV (Hopper Platform), DISH Anywhere, and Sling TV service, and/or inducing others to do the same. DISH derives revenue from the activities relating to these Accused Instrumentalities.

110. As illustrated in Exhibit 7, which is incorporated herein by reference, DISH infringes at least Claim 8 of the '546 Patent through its implementation of the session authorization protocols in the Accused Instrumentalities.

111.    DISH took the above actions intending to infringe and/or to cause infringing acts by others. For example, DISH and Sling TV promote limits on concurrent streams for user accounts.

112.    On information and belief, DISH also actively, knowingly, and intentionally induces infringement of one or more claims of the '546 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Instrumentalities.

113.    DISH's acts of infringement have caused damage to Adeia. Adeia is entitled to recover from DISH the damages sustained by Adeia as a result of its wrongful acts in an amount subject to proof at trial.

114.    Adeia provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality and reserves the right to present additional or alternative explanations of infringement for other claims and functionalities of the services.

## COUNT III: INFRINGEMENT OF THE '013 PATENT

115.    Adeia incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

116.    DISH has directly infringed and continues to directly infringe the '013 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, offering to sell in the United States, and/or importing into the United States infringing products and/or services, including at least the DISH TV (Hopper Platform) and Sling TV service, and/or inducing others to do the same. DISH derives revenue from activities relating to these Accused Instrumentalities.

117. As illustrated in Exhibit 8, which is incorporated herein by reference, DISH infringes at least Claim 8 of the '013 Patent through its implementation of server-side ad insertion in the Accused Instrumentalities.

118. DISH took the above actions intending to infringe and/or to cause infringing acts by others. For example, DISH advertises, operates, and supports DISH TV's and Sling TV's live and on-demand streaming with server-side ad insertion and adaptive streaming across platforms, encourages customers to stream on-web and in-device apps, and provides instructions and support that result in the generation, transmission, and use of the dynamically created index files that practice the claimed methods.

119. On information and belief, DISH also actively, knowingly, and intentionally induces infringement of one or more claims of the '013 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Instrumentalities.

120. DISH's acts of infringement have caused damage to Adeia. Adeia is entitled to recover from DISH the damages sustained because of DISH's wrongful acts in an amount subject to proof at trial.

121. Adeia provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality and reserves the right to present additional or alternative explanations of infringement for other claims and functionalities of the services.

### COUNT IV: INFRINGEMENT OF THE '758 PATENT

122. Adeia incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

42

123.    DISH has directly infringed and continues to directly infringe the '758 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, offering to sell in the United States, and/or importing into the United States infringing products and/or services, including at least the DISH TV (Hopper Platform) and/or inducing others to do the same. DISH derives revenue from activities relating to these Accused Instrumentalities.

124.    As illustrated in Exhibit 9, which is incorporated herein by reference, DISH infringes at least Claim 11 of the '758 Patent through its implementation of message overlays during media playback in the Accused Instrumentalities.

125.    DISH took the above actions intending to infringe and/or to cause infringing acts by others. For example, DISH promotes on-screen messages and notifications during playback on Hopper receivers, including overlays that are composited over high-definition video frames, and provide product materials and support resources that encourage users to enable and use these overlay features.

126.    On information and belief, DISH also actively, knowingly, and intentionally induces infringement of one or more claims of the '758 Patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Instrumentalities.

127.    DISH's acts of infringement have caused damage to Adeia. Adeia is entitled to recover from DISH the damages sustained by Adeia as a result of its wrongful acts in an amount subject to proof at trial.

128. Adeia provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality and reserves the right to present additional or alternative explanations of infringement for other claims and functionalities of the services.

### COUNT V: INFRINGEMENT OF THE '049 PATENT

129. Adeia incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

130. DISH has directly infringed and continues to directly infringe the '049 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, offering to sell in the United States, and/or importing into the United States infringing products and/or services, including at least the DISH TV (Hopper Platform) and Sling TV service, and/or inducing others to do the same. DISH derives revenue from activities relating to these Accused Instrumentalities.

131. As illustrated in Exhibit 10, which is incorporated herein by reference, DISH infringes at least Claim 15 of the '049 Patent through its implementation of server-side ad insertion in the Accused Instrumentalities.

132. DISH took the above actions intending to infringe and/or to cause infringing acts by others. For example, DISH and Sling publicly promote dynamic ad insertion into live and on-demand streams, describe addressable and programmatic ad capabilities, and operate server-side workflows that generate and serve the interspersed manifest specifications used by client devices to request interleaved content and ad segments.

133. On information and belief, DISH also actively, knowingly, and intentionally induces infringement of one or more claims of the '049 Patent under 35 U.S.C. § 271(b) by actively

encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Instrumentalities.

134.    DISH's acts of infringement have caused damage to Adeia. Adeia is entitled to recover from DISH the damages sustained because of DISH's wrongful acts in an amount subject to proof at trial.

135.    Adeia provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality and reserves the right to present additional or alternative explanations of infringement for other claims and functionalities of the services.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on any and all issues triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Adeia Technologies Inc., Adeia Media Holdings Inc., and Adeia Media Solutions Inc. ask this Court for an order granting the following relief:

A.    A judgment in favor of Plaintiffs that Defendants have infringed, either literally and/or under the doctrine of equivalents, one or more claims of the '927, '546, '013, '758, and '049 Patents;

B.    A judgment and order finding that Defendants' infringement has been willful;

C.    A permanent injunction prohibiting Defendants from further acts of infringement;

D.    A judgment and order requiring Defendants to pay Plaintiffs damages sufficient to compensate Plaintiffs for Defendants' infringement of the Asserted Patents, but in no event less than a reasonable royalty, including supplemental damages post-verdict, together with pre- and post-judgment interest and costs;

E.      A judgment and order declaring that Plaintiffs are entitled to enhanced damages pursuant to 35 U.S.C. § 284;

F.      A judgment and order declaring that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiffs their reasonable attorneys' fees against Defendants; and

G.      Any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: March 31, 2026

Respectfully submitted,

By: /s/ Brian S. Boerman

Brian S. Boerman
CO State Bar No. 50834
bboerman@sheridanross.com
**SHERIDAN ROSS P.C.**
1560 Broadway, Suite 1200
Denver, CO 80202
Telephone: 303-863-9700
Facsimile: 303-863-0223
litigation@sheridanross.com

Richard A. Kamprath
(application for admission forthcoming)
Bradley Jarrett
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
rkamprath@mckoolsmith.com
bjarrett@mckoolsmith.com

Joshua Budwin
(application for admission forthcoming)
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744
jbudwin@mckoolsmith.com

*Attorneys for Plaintiffs*
*Adeia Technologies Inc.; Adeia Media*
*Holdings Inc.; and Adeia Media Solutions Inc.*